346 So.2d 1354 (1977)
E. J. ABSHIRE et ux., Plaintiffs-Appellants,
v.
SOUTHERN FARM BUREAU CASUALTY INSURANCE COMPANY et al., Defendants-Appellees.
No. 5906.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1977.
Rehearing Denied June 24, 1977.
*1356 Thompson & Sellers by Charles M. Thompson, Jr., Abbeville, for plaintiffs-appellants.
Edwards, Stefanski & Barousse by Larry C. Dupuis, Crowley, Andrew J. Vidrine, Church Point, for defendants-appellees.
Before HOOD, FORET and HEARD, JJ.
HOOD, Judge.
Mr. and Mrs. E. J. Abshire claim damages for personal injuries sustained by Mrs. Abshire as a result of a motor vehicle accident. The defendants are Chester Faulk, Southern Farm Bureau Casualty Insurance Company and Acadia Parish Police Jury. Judgment was rendered by the trial court in favor of defendants, dismissing plaintiffs' suit. Plaintiffs appealed.
The principle issues presented are (1) whether defendant Faulk was negligent, (2) whether the Acadia Parish Police Jury was negligent, and (3) whether plaintiffs are barred from recovery by the contributory negligence of Mrs. Abshire.
The accident occurred about 3:50 P.M., on May 30, 1973, at or near the intersection of a blacktopped road and a gravel road, in a rural part of Acadia Parish. Both of the above thoroughfares are parish roads.
Immediately before the accident occurred, Mrs. Abshire was driving her community-owned automobile north on the blacktopped road. Shortly before she reached the above intersection a pickup truck, owned and being driven by defendant Faulk, entered the crossing from her right. Mrs. Abshire applied her brakes as soon as she saw the Faulk truck, and she veered to her right to avoid striking it. The vehicles did not collide, but Mrs. Abshire lost control of her car when it ran over some loose gravel as she entered the crossing and attempted to swerve around the rear of the truck. Her automobile first ran off the east side of the blacktopped highway. It then re-crossed that thoroughfare, ran off the west side of it, crossed a ditch and went through a fence, and it finally came to rest in a field on the west side of the blacktopped road, about thirty feet west of the above ditch.
The weather was clear and dry. Mrs. Abshire was travelling between 55 and 60 miles per hour as she approached the crossing. The speed at which she was driving *1357 was within the legal speed limit at that time. The wheels of her car skidded when she applied the brakes, leaving 92 feet of skid marks immediately before her car first entered the intersection.
Faulk was driving west on the gravel road at a speed of 25 or 30 miles per hour immediately before the accident occurred. He saw the Abshire automobile approaching from his left before he reached the crossing, when he was about 25 yards from the center of the intersection. He estimated that Mrs. Abshire was 100 yards from the center of the crossing and was travelling at a speed of 60 miles per hour at that time. He reduced the speed of his vehicle slightly after he first observed Mrs. Abshire approaching, but he then decided that he could get across the intersection before she reached it, so he proceeded to cross the blacktopped road. He increased the speed of his truck while he was in the intersection "to be sure we had plenty of clearance between us." He saw the accident occur through his rear view mirror after he went through the intersection, and thereafter he stopped his truck on the gravel road, west of the blacktopped thoroughfare.
There were no stop signs or traffic signals at that intersection when the accident occurred. The evidence shows that the Acadia Parish Police Jury erected stop signs at that crossing when the north-south road was blacktopped in the early 1960's, but that those signs were removed or destroyed before this accident occurred. The stop signs, while they were in place, directed motorists on the gravel road to stop before entering the intersection. The Police Jury has never formally designated the blacktopped road as the preferred thoroughfare at that crossing, but it apparently has had a policy for years of making a blacktopped road the preferred route at points where it is intersected by gravel roads. The president of the Police Jury, who also is the parish manager, testified for instance that at the time of the accident it was still the policy of the Police Jury "for the gravel road to recognize the blacktop road as having a right-of-way." The road foreman for the Police Jury testified that "we put the stop signs to give the blacktop the right-of-way." The state trooper who investigated the accident testified that the people travelling that road "take for granted that this blacktop road has the right-of-way," and he put in his report of the accident that "this parish blacktop is taken for granted by the public to have the right-of-way."
Both of the drivers, Faulk and Mrs. Abshire, were thoroughly familiar with that particular intersection. Faulk testified, in fact, that he traverses it about five times per week. Both of them considered the blacktopped road as being the preferred thoroughfare at that intersection, and Faulk admitted that vehicles travelling on the gravel road customarily stopped or yielded the right-of-way to vehicles which were on the blacktopped thoroughfare. Faulk testified that he customarily "let the blacktopped go on and have the right-of-way," that he felt that ". . . the blacktop would have the right-of-way," and that he did not expect Mrs. Abshire to stop before proceeding to cross the gravel road. He stated that when he approached that intersection while on the gravel road "if I would see somebody coming I would come to a complete stop."
There is a conflict in the testimony of the drivers as to the position of the Faulk truck when Mrs. Abshire entered the intersection. Faulk testified that he had completely traversed the intersection and had reached a point 100 yards west of that crossing before the Abshire vehicle entered it. Mrs. Abshire testified that the Faulk truck was in the intersection as she traversed it, that she "swerved to the right" in order to avoid running broadside into it, and that she "missed his back bumper . . . a foot and a half or two feet."
If we accept Faulk's own testimony as to the speed of each vehicle as it approached the intersection, the distance each was from that junction when Faulk first observed Mrs. Abshire, and the distance the Abshire car traveled after it traversed the crossing, we find it difficult to rationalize how Faulk could have travelled 100 yards beyond the *1358 intersection before Mrs. Abshire entered it. The evidence convinces us that Faulk entered the crossing directly in front of the Abshire vehicle, at a time when it was unsafe for him to do so, and that it was only because of the evasive action taken by Mrs. Abshire that a collision between the two vehicles was avoided.
The trial judge found that Faulk preempted the intersection, and based on that finding he concluded that Faulk was not negligent. He rendered judgment, therefore, in favor of Faulk and his insurer, Southern Farm Bureau Casualty Insurance Company, rejecting plaintiffs' demands.
Before a motorist can successfully rely on the doctrine of preemption, he must show that he entered the intersection at a proper speed and sufficiently in advance of the car approaching from another direction to permit him to cross without requiring any emergency stop by the other vehicle. Entry into the intersection at the same time, or just a fraction of a second ahead of the other vehicle, does not constitute a preemption of the crossing. Byers v. Creel, 198 So.2d 739 (La.App. 4 Cir. 1967); West v. Travelers Indemnity Company, 225 So.2d 139 (La.App. 4 Cir. 1969); Robertson v. Ratcliff, 260 So.2d 155 (La.App. 2 Cir. 1972); Rhodus v. Allstate Insurance Company, 192 So.2d 226 (La.App. 4 Cir. 1966); Ernst v. O'Bannion, 278 So.2d 830 (La.App. 3 Cir. 1973); writ denied, 281 So.2d 749.
In the instant suit Faulk entered the intersection directly in front of the approaching Abshire vehicle, just a fraction of a second before Mrs. Abshire entered it, when it should have been apparent to him that he could not safely traverse that crossing without requiring an emergency stop by the other vehicle. We conclude that the mere fact that Faulk entered the intersection a moment before the Abshire vehicle entered it was not sufficient to constitute a preemption of that crossing, and it did not relieve Faulk from negligence or liability.
We believe that the question of which of the two drivers had the legal right-of-way is immaterial here. If the blacktopped road was the preferred highway, then Faulk unquestionably was negligent in having failed to stop before entering the intersection. If neither highway was preferred, however, and Faulk is correct in his contention that he was entitled to the right-of-way since he approached the highway from Mrs. Abshire's right, then we have concluded that he nevertheless was negligent in having failed to yield to the Abshire vehicle under the circumstances presented here.
A greater degree of care is required of a motorist who enjoys only a directional right-of-way than is required of a driver approaching an intersection on a right-of-way street, where the other intersecting street is controlled by stop signs. Such a motorist must maintain a proper lookout and must exercise reasonable care and caution as he nears the crossing. If he sees or should see that the approaching vehicle will continue its approach and will ignore the right-of-way, then he will be held to be negligent if he fails to take every available and reasonable precaution to avoid a collision. Schmidt v. Schwall, 265 So.2d 357 (La.App. 4 Cir. 1972); Bergeron v. Trueblood, 266 So.2d 742 (La.App. 4 Cir. 1972); Smith v. Borchers, 243 La. 746, 146 So.2d 793 (1962).
In Smith v. Borchers, supra, our Supreme Court said:
"* * * Even when one has the right of way he is not relieved from the necessity of looking into the direction from which others may be expected to come, and where such care would have prevented the accident, he who fails to look or to keep a proper lookout cannot recover, even though the other party was grossly at fault."
In the instant suit both drivers felt that the blacktopped highway was preferred over the gravel road at that crossing. Mrs. Abshire thought she had the right-of-way, as did other motorists using the blacktopped road. She assumed that Faulk would yield the right-of-way to her, and based on that assumption she did not intend to stop at the crossing. Faulk also felt that *1359 Mrs. Abshire was on the preferred highway. He saw her approach the intersection in ample time to enable him to stop, and he testified that he knew at that time that she did not intend to stop at the crossing. Under those circumstances, we conclude that Faulk was negligent in attempting to cross the blacktopped highway without stopping or without yielding the right-of-way to the Abshire vehicle. His negligence was a proximate cause of the accident.
We find that Mrs. Abshire was free from negligence. She was driving her automobile within the speed limit and at a reasonable rate of speed. Because of the custom in that area, we feel that she was not negligent in assuming that Faulk would yield the right-of-way to her at that intersection, since she was travelling on the blacktopped road. She was maintaining a proper lookout as she approached the crossing, and we think she observed that Faulk did not intend to yield the right-of-way as soon as it reasonably was possible for her to do so. As soon as she made that observation she did all that she reasonably could do to avoid an accident.
Faulk suggests that if Mrs. Abshire had not veered to her right while in the crossing, she would not have lost control of her car, and she also would not have collided with his truck. The evidence does not convince us that an accident would have been avoided if Mrs. Abshire had followed that course of action. Even if it would have been better for her to have taken that action, however, we find that Mrs. Abshire was confronted with an emergency when Faulk suddenly entered the crossing in front of her, and we think the efforts she made to avoid an accident were reasonable under those circumstances. We conclude that she was not negligent, and that plaintiffs are not barred from recovery because of contributory negligence on her part.
We turn now to the question of whether Acadia Parish Police Jury was negligent and thus is liable in damages. Plaintiffs contend that the Police Jury was negligent in failing to cut the weeds and shrubs in the southeast quadrant of the above road junction, so that the view of a motorist approaching from the south or east would not be obscured. They also argue that the Policy Jury was negligent in failing to maintain a stop sign at that crossing.
The evidence shows that the weeds and shrubbery at that intersection were not high enough to prevent the two motorists involved here from observing each other as they approached the intersection. Faulk admits that he saw Mrs. Abshire approaching the crossing when he was 25 yards from it. The failure of the Police Jury to erect or to replace the stop sign at that intersection was not a cause of the accident. Both parties were thoroughly familiar with that intersection. Faulk saw the Abshire vehicle approaching, and he knew that the driver could not and did not intend to stop. He also knew that, by custom at least, the blacktopped road was regarded by motorists as being the preferred thoroughfare, and that Mrs. Abshire would expect him to yield the right-of-way to her. The presence of a stop sign at that corner would not have given Faulk any warning or information he did not already have, and it thus would not have avoided an accident.
We agree with the trial court that the Acadia Parish Police Jury was free from negligence and is not liable.
Our conclusion is that plaintiffs are entitled to recover from defendant Faulk and from his insurer, Southern Farm Bureau, for the damages which plaintiffs sustained as a result of this accident. The trial judge erred, therefore, in rejecting plaintiffs' demands against those defendants.
Mrs. Abshire sustained injuries to her right shoulder, right arm, left leg and left hip as a result of the accident. She later developed a back condition which is painful, but we have decided that the abnormal condition of her back did not result from the above automobile accident.
Immediately after the accident occurred Mrs. Abshire was treated by Dr. Eugene S. Fields, a surgeon, and she remained under his treatment until he discharged her about two and one-half months later, on August 7, *1360 1973. He found that she sustained massive contusions about her right shoulder and arm, and bruises on her upper left leg and left hip. An x-ray examination disclosed no fractures, dislocations or bone injuries of any kind. She was not hospitalized, except for her initial examination and treatment in the emergency room at a local hospital on the day of the accident. The treatment administered to her by Dr. Fields included cortisone injections in the shoulder, physical therapy and tranquilizers. The doctor confirmed Mrs. Abshire's testimony that she suffered severe pain during that time, and that she was still suffering pain in her shoulder when he discharged her. In view of her continued complaints, he recommended that she see an orthopedic surgeon.
Plaintiff did not see Dr. Fields again until March 5, 1976, more than two and one-half years later. At that time she complained of severe pain in her chest and in her shoulder. Her chest x-rays were essentially negative. Dr. Fields at that time again injected cortisone in her shoulder and administered tranquilizers. He felt that her shoulder pain had caused her to have an "acute anxiety reaction," which caused the chest pain. In his opinion the shoulder pain which she experienced in 1976 was "related" to the accident which occurred on May 30, 1973. The evidence does not show whether she has had any recurrence of her shoulder pain. Her other injuries, that is, the injuries to her right arm, left leg and left hip, apparently cleared up by the time Dr. Fields first discharged her, on August 7, 1973.
We have decided that an award of $5,000.00 to Mrs. Abshire for the above injuries, and for the pain and suffering she underwent as a result of those injuries, would be fair and adequate.
Mrs. Abshire did not complain of pain in her back on the day of the accident, or at any time while Dr. Fields was treating her. In September, 1973, however, or more than three months after the accident occurred, she experienced severe pain in her lower back area when she tried to straighten up after stooping over to pick up some merchandise in a store. She testified that she was hospitalized immediately and was treated by the late Dr. G. Dunning, an orthopedic surgeon. After Dr. Dunning's death she was treated for her back condition by Dr. John D. Jackson, a neurosurgeon, who concluded that plaintiff's two lower discs are "abnormal," that they are causing her symptoms and that corrective surgery should be performed.
The evidence shows, however, that Mrs. Abshire sustained a severe back injury in an earlier motor vehicle accident which occurred in 1964 or 1965. As a result of that injury she underwent surgery which consisted of a lumbar laminectomy, with the removal of a bulging disc. She wore a back brace for two years thereafter, and although she recovered substantially from that back injury, she had not recovered sufficiently by May 30, 1973, to enable her to do some of her household duties such as sweeping or mopping. She instituted suit for damages resulting from the back injury she suffered in that first accident, and she eventually entered into a compromise settlement of her claim.
As we interpret the opinions of the two treating physicians who testified, Dr. Fields concluded that plaintiff's back injury did not result from the accident of May 30, 1973. Dr. Jackson expressed the opinion that her back condition is related to the automobile accident, but he based that conclusion on an incorrect assumption that Mrs. Abshire has been suffering pain in her back continuously since the date of the accident. The evidence shows that she did not experience back pain until several months after the accident, when she attempted to pick up a small package in a store. When asked to assume those facts, which we find to be true, Dr. Jackson then expressed the view that Mrs. Abshire's back symptoms resulted from the store incident, and not from the automobile accident.
We have concluded that the abnormal condition of Mrs. Abshire's back did not result from the accident which occurred on May 30, 1973. She thus is not entitled to recover damages for that claimed injury.
*1361 Plaintiffs incurred medical expenses amounting to $422.18 for the treatment of Mrs. Abshire's injuries. The community-owned automobile was damaged as a result of the accident to the extent that it was a total loss. It had a value of $1,425.00 at the time of the loss. Mr. Abshire is entitled to recover for these special damages.
For the reasons assigned, the judgment appealed from is reversed insofar as it rejects plaintiffs' demands against defendants, Chester Faulk and Southern Farm Bureau Casualty Insurance Company, and insofar as it condemns plaintiffs to pay the costs of court. Judgment is hereby rendered (1) in favor of plaintiff, Mrs. Mary Lou Abshire, and against defendants, Chester Faulk and Southern Farm Bureau Casualty Insurance Company, in solido, for the sum of $5,000.00, with legal interest thereon from date of judicial demand until paid; and (2) in favor of plaintiff, E. J. Abshire, and against defendants, Chester Faulk and Southern Farm Bureau Casualty Insurance Company, in solido, for the sum of $1,847.18, with legal interest thereon from date of judicial demand until paid, and for all costs of this suit. The judgment appealed from is affirmed in all other respects, and particularly insofar as it rejects the demands of plaintiffs, and the third party demands of Chester Faulk and Southern Farm Bureau Casualty Insurance Company, against defendant Acadia Parish Police Jury.
The costs of this appeal are assessed to defendants-appellees, Chester Faulk and Southern Farm Bureau Casualty Insurance Company.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.